1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                     February 2018 Grand Jury

11   UNITED STATES OF AMERICA,          CR No. CR 18-00774-JAK

12              Plaintiff,              I N D I C T M E N T

13              v.                      [21 U.S.C. § 846: Conspiracy to
                                        Possess with Intent to Distribute
14   CARMEN MEREJIL,                    and to Distribute Controlled
       aka "Caveman,"                   Substances; 21 U.S.C.
15   ARMANDO CONTRERAS,                 §§ 841(a)(1), (b)(1)(A),
       aka "Risky,"                     (b)(1)(B): Possession with Intent
16     aka "R,"                         to Distribute, and Distribution
     ALEJANDRO SANDOVAL,                of, Methamphetamine; 18 U.S.C.
17     aka "Squeaky,"                   § 922(g)(1): Felon in Possession
     EDWARD ROSALES,                    of a Firearm and Ammunition]
18     aka "Solo,"
     MANUEL GARCIA,
19     aka "Lil Evil,"
       aka "E,"
20   GALDINO DIAZ,
       aka "Dino,"
21     aka "D,"
     CHITO JARA,
22   ESTHER CHAN,
     MARISELA RAMIREZ, and
23   CRISTAL GOMEZ RAYO,

24              Defendants.

25

26

27

28

1    The Grand Jury charges:

2                     GENERAL ALLEGATIONS

3    At all times relevant to this Indictment:

4      1.    The East Side Torrance drug trafficking organization ("EST

5 DTO") was a drug trafficking organization associated with the East

6 Side Torrance  street gang (the "EST Gang"), and operated in the

7 Central District of California and elsewhere.

8      2.    The EST Gang was a multi-generational street gang within

9 the "Harbor Gateway" area of the City of Los Angeles.  The EST Gang

10 was formed in the 1970s in the area near the intersection of Menlo

11 Avenue and West 228th Street.  Over the intervening years, the EST

12 Gang grew to presently claim "territory" bounded by West 223rd Street

13 on the north, South Normandie Avenue on the east, West Sepulveda

14 Boulevard on the south, and South Western Avenue, which is the

15 eastern boundary of the City of Torrance, to the west ("EST Gang

16 Territory").  EST Gang Territory has, at times, also included the

17 area north of West 223rd Street between Normandie and Western Avenues

18 extending northward to Carson Street.

19      3.    The EST DTO was a drug trafficking operation associated

20 with the EST Gang.  Many of the members of the EST DTO were members

21 of the EST Gang; however, not all EST Gang members were members of

22 the EST DTO, and the EST DTO included persons who were not members of

23 the EST Gang.  The EST DTO controlled drug distribution within EST

24 Gang Territory, and also conducted drug distribution outside EST Gang

25 Territory.  A portion of the revenue collected by the EST DTO was

26 paid to a prison-based criminal organization for "authorization" to

27 sell controlled substances in EST Gang Territory unhindered.

28

4. The EST DTO maintained control of its drug trafficking activities in conjunction with the EST Gang by attacking and threatening non-EST Gang or DTO members who entered EST Gang Territory; intimidating and threatening residents in EST Gang Territory; and using EST Gang graffiti, hand signs, and other symbols and paraphernalia within EST Gang Territory to indicate that the EST Gang controlled the area, and that the EST DTO was the exclusive illegal drug seller in EST Gang Territory. Members of the EST Gang and DTO also possessed and carried firearms in order to maintain control of EST Gang Territory, as well as to retaliate against rivals.

5. The EST DTO attempted to control all drug trafficking within EST Gang Territory by its members. In order to do so, EST DTO members extorted money from other drug traffickers who were not members of the EST DTO who sold methamphetamine, heroin, and other drugs in EST Gang Territory. These non-EST DTO drug traffickers were forced to pay a "tax" (a portion of the proceeds of drug sales) to principals of the EST DTO. If a non-EST DTO drug trafficker refused to pay the tax to the EST DTO, that drug trafficker faced reprisals from EST DTO and/or EST Gang members, including fines, robbery, and threatened or actual violence. On the other hand, if a non-EST DTO drug trafficker did pay the tax to the EST DTO, that drug trafficker would be given authorization from the EST DTO to sell drugs in EST Gang Territory and would not receive interference from the EST DTO or EST Gang.

6. The central hub for the EST DTO's drug trafficking activities was the Normandale Recreation Center, a park and community

3

recreation facility located between Normandie Avenue and Halldale Avenue along West 225th Street in the City of Los Angeles.

7.    EST DTO members were typically expected to participate in drug trafficking on behalf of the EST DTO, as well as in other activities such as protecting drug trafficking activities, assisting in the enforcement of taxation of non-EST DTO members, and ensuring that the EST DTO's drug trafficking activities avoided detection by law enforcement.  This often was referred to as "putting in work." New members of the EST DTO were required to "put in work" in order to earn "respect" within the organization, and to help ensure the EST DTO's control over EST Gang Territory.

8.    The EST DTO included members and associates of other gangs or DTOs, or others who were unaffiliated.  EST DTO associates often acted on behalf of, and for the benefit of, the EST DTO, by engaging in supplying, possessing, and re-selling drugs as well as money laundering and assisting in avoiding detection of the EST DTO by law enforcement.

9.    The EST DTO was controlled principally by a senior member of the EST Gang (the "Shotcaller").  The Shotcaller was responsible for ensuring that the goals of the EST DTO were met.  These goals included generating revenue by managing the drug trafficking activities in EST Gang Territory and extorting tax proceeds from non-EST DTO drug dealers, among others.

10.    The EST DTO had a symbiotic relationship with the EST Gang, and functioned as the primary revenue-generating branch of the EST Gang; while the EST Gang conducted surveillance and detection of law enforcement as well as territorial protection, enforcement, and retaliation activities.  EST Gang members and members of the EST DTO

4

engaged in overt conduct designed to explicitly demarcate EST Gang
Territory, in which only the EST DTO was allowed to sell controlled
substances unhindered.   EST Gang members generally wore clothing that
identified them as EST Gang members, including blue, baby blue, and
black.   The EST Gang has adopted the panther as its symbol, and EST
Gang members commonly wore clothing associated with the "Carolina
Panthers" National Football League franchise (the uniforms of which
also display the colors blue, baby blue, and black), in order to
exhibit their association with the EST Gang.   EST Gang members often
tattooed an image of a panther, "EST," or "TORRANCE," in prominent
places on their bodies, including their face, neck, chest, back, and
on the top or back of their heads, and display these tattoos to show
their membership in, and loyalty to, the EST Gang.   EST Gang members
commonly used "T" or "E" hand signs to identify membership or
allegiance to the EST Gang, and to intimidate rivals and members of
the public.   Finally, EST Gang members identified EST Gang Territory
by spray-painting, or "tagging," on street signs, walls, and
buildings such things as the letters "EST," "Torrance," "EST XIII,"
"BEST," (for "Barrio EST") and as well as the monikers (street names)
of EST Gang members.

COUNT ONE

[21 U.S.C. § 846]

Paragraphs 1 through 10 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about November 1, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendants CARMEN MEREJIL, also known as ("aka") "Caveman" ("MEREJIL"), ARMANDO CONTRERAS, aka "Risky," aka "R" ("CONTRERAS"), ALEJANDRO SANDOVAL, aka "Squeaky" ("SANDOVAL"), EDWARD ROSALES, aka "Solo" ("ROSALES"), MANUEL GARCIA, aka "Lil Evil," aka "E" ("GARCIA"), GALDINO DIAZ, aka "Dino," aka "D" ("DIAZ"), CHITO JARA ("JARA"), ESTHER CHAN ("CHAN"), MARISELA RAMIREZ ("RAMIREZ"), and CRISTAL GOMEZ RAYO ("RAYO"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally possess with intent to distribute, and distribute, the following controlled substances:

1.   at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

2.   at least five grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii);

3.   cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C);

4.     heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C);

5.     hydrocodone, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); and

6.     3,4-methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1.     Defendant MEREJIL and others known and unknown to the Grand Jury would authorize EST DTO members to control drug trafficking in EST Gang Territory.

2.     Defendants MEREJIL, CONTRERAS, SANDOVAL, ROSALES, and JARA, and others known and unknown to the Grand Jury, would obtain large quantities of controlled substances including methamphetamine, cocaine, heroin, MDMA and hydrocodone, for redistribution.

3.     Defendants MEREJIL and SANDOVAL, and others known and unknown to the Grand Jury, would maintain a "stash house" on behalf of the EST DTO where controlled substances were weighed and packaged for redistribution.

4.     Defendants MEREJIL, CONTRERAS, SANDOVAL, ROSALES, GARCIA, DIAZ, JARA, CHAN, and RAMIREZ, and others known and unknown to the Grand Jury, would obtain, possess with the intent to distribute, and distribute controlled substances in EST Gang Territory and elsewhere.

5.    Defendants MEREJIL, GARCIA, DIAZ, RAMIREZ, and RAYO, and others known and unknown to the Grand Jury, would package controlled substances for smuggling and smuggle them into the Kern Valley State Prison, to be received by an incarcerated EST Gang member ("the EST Inmate"), and who would redistribute the controlled substances in the prison and provide payment for the drugs back to defendant MEREJIL and other EST DTO members.

6.    Defendants MEREJIL and CONTRERAS, and others known and unknown to the Grand Jury, would arrange for the transportation of controlled substances to an unindicted co-conspirator in the area of Delta, Colorado (the "CO Distributor") for redistribution there.

7.    Defendants MEREJIL, CONTRERAS, SANDOVAL, ROSALES, GARCIA, and DIAZ, and others known and unknown to the Grand Jury, would obtain and possess firearms and other dangerous weapons, and would broker firearms transactions, in order to enforce the authority of the EST DTO in EST Gang Territory, exclude other drug traffickers from EST Gang Territory, and permit the EST DTO to control the drug trafficking activity in EST Gang Territory.

C.    OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the following dates, defendants MEREJIL, CONTRERAS, SANDOVAL, ROSALES, GARCIA, DIAZ, JARA, CHAN, RAMIREZ, and RAYO, and others known and unknown to the Grand Jury, committed various overt acts, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    Between approximately 2014 and 2016, an unindicted co-conspirator introduced the CO Distributor to defendant

MEREJIL, for the purpose of defendant MEREJIL establishing a
controlled substances distribution relationship with the CO
Distributor.

Overt Act No. 2:    Between approximately 2014 and 2016,
defendant MEREJIL introduced the CO Distributor to defendant
CONTRERAS and told the CO Distributor that defendant CONTRERAS would
supply controlled substances to the CO Distributor for the CO
Distributor to re-sell to consumers in the area of Delta, Colorado.

Overt Act No. 3:    On or about February 16, 2016, in EST Gang
Territory, defendant MEREJIL sold approximately 111.9 grams of a
mixture and substance containing a detectable amount of
methamphetamine to a Confidential Source ("CS") working with law
enforcement ("CS1").

Overt Act No. 4:    On or about March 10, 2016, in EST Gang
Territory, defendant SANDOVAL possessed for distribution on his
person approximately 81.44 grams of methamphetamine in two separate
packages, and approximately $5,245 in cash.

Overt Act No. 5:    On or about March 10, 2016, inside an
apartment adjacent to EST Gang Territory (the "stash house"),
defendants MEREJIL and SANDOVAL possessed approximately 8.902
kilograms of methamphetamine, approximately 31.11 grams of a mixture
and substance containing a detectable amount of cocaine,
approximately 19 pills of MDMA, three digital scales, acetone,
denatured alcohol, methanol, a Pyrex bowl containing white
crystalline residue, a police scanner radio, a four-camera security
video device, a statue of a black panther, methamphetamine contained
in a suppository-shaped condom to allow for easy insertion into a
body cavity, documents referencing "EST XIII," mail and letters

9

addressed to defendant SANDOVAL, and documents setting forth amounts owed or paid for controlled substances including by defendant MEREJIL, the CO Distributor, and others.

Overt Act No. 6:    On or about July 19, 2016, defendant ROSALES possessed approximately 27.6 grams of methamphetamine with the intent to distribute it, which was concealed in the plastic center panel of his car.

Overt Act No. 7:    On or about November 10, 2016, by text message and telephone call using coded language, defendant ROSALES asked defendant MEREJIL if defendant MEREJIL had controlled substances available for sale, and defendant MEREJIL offered to provide defendant ROSALES with controlled substances for further distribution.

Overt Act No. 8:    On or about November 10, 2016, by text message using coded language, defendant CHAN told defendant MEREJIL that she had high-quality controlled substances supplied by defendant JARA to provide to defendant MEREJIL.

Overt Act No. 9:    On or about November 12, 2016, by text message using coded language, defendant MEREJIL advised defendant CHAN to convey to defendant JARA, in an effort to obtain good prices on controlled substances, that defendant MEREJIL reported to a senior gang member with whom both defendants MEREJIL and JARA were familiar.

Overt Act No. 10:    On or about November 12, 2016, by telephone using coded language, defendant MEREJIL discussed with defendant JARA the pricing of controlled substances available for sale by defendant JARA.

Overt Act No. 11:    On or about November 12, 2016, by telephone using coded language, defendants MEREJIL and GARCIA engaged in a

1   lengthy discussion with an unindicted co-conspirator incarcerated at
2   Kern Valley State Prison in which they agreed to provide the
3   unindicted co-conspirator with heroin and cocaine to be smuggled into
4   Kern Valley State Prison and also provided the telephone number for
5   the EST Inmate, so that the unindicted co-conspirator could obtain
6   heroin inside Kern Valley State Prison from the EST Inmate.

7        Overt Act No. 12:   On or about November 13, 2016, by text
8   message using coded language, defendant ROSALES asked defendant
9   MEREJIL if defendant MEREJIL could provide defendant ROSALES with an
10  amount of controlled substances for further distribution, and
11  defendant MEREJIL told defendant ROSALES that defendant ROSALES owed
12  defendant MEREJIL for a three-ounce controlled substances sales-
13  related debt, to which defendant ROSALES agreed.

14       Overt Act No. 13:   On or about November 13, 2016, by text
15  message using coded language, defendant MEREJIL requested that
16  defendant RAMIREZ obtain controlled substances for defendant ROSALES,
17  and defendant RAMIREZ provided information regarding the quantity and
18  price of the controlled substances.

19       Overt Act No. 14:   On or about November 13, 2016, by telephone
20  using coded language, defendant MEREJIL told an unindicted co-
21  conspirator that he needed to get a stash house, and that he intended
22  only to deal in kilogram quantities of controlled substances.

23       Overt Act No. 15:   On or about November 15, 2016, by text and
24  multimedia messages using coded language, defendant CONTRERAS sent a
25  photograph of four firearms to defendant MEREJIL, and defendants
26  MEREJIL and CONTRERAS discussed the price and possibility of
27  purchasing the firearms.
28

                                11

1        Overt Act No. 16:    On or about November 16, 2016, by telephone

2    using coded language, defendant MEREJIL told defendant ROSALES that

3    defendant MEREJIL was prepared to provide defendant ROSALES with

4    controlled substances to settle an outstanding debt.

5        Overt Act No. 17:    On or about November 16, 2016, by text

6    message and telephone using coded language, an unindicted co-

7    conspirator asked defendant MEREJIL to provide him with controlled

8    substances, and defendant MEREJIL agreed to do so and told him to

9    come to defendant MEREJIL's house.

10       Overt Act No. 18:    On or about November 16, 2016, by telephone

11   using coded language, defendant CONTRERAS advised defendant MEREJIL

12   that the CO Distributor owed money to defendant CONTRERAS, and that

13   defendant CONTRERAS had asked his firearms supplier to hold for

14   defendant CONTRERAS the firearms depicted in the photograph defendant

15   CONTRERAS had sent defendant MEREJIL on the previous day.

16       Overt Act No. 19:    On or about November 16, 2016, defendant

17   MEREJIL distributed methamphetamine to two unindicted co-

18   conspirators, who drove with the methamphetamine into EST Gang

19   Territory and were arrested.

20       Overt Act No. 20:    On or about November 17, 2016, by telephone

21   using coded language, defendant MEREJIL discussed with an unindicted

22   co-conspirator the unindicted co-conspirator's arrest on November 16,

23   2016.

24       Overt Act No. 21:    On or about November 17, 2016, by telephone

25   using coded language, defendant MEREJIL asked defendant JARA to save

26   two units of controlled substances for defendant MEREJIL so defendant

27   MEREJIL could purchase them later.

28

1    <u>Overt Act No. 22:</u>    On or about November 19, 2016, by text
2    message and telephone using coded language, defendant CHAN told
3    defendant MEREJIL that defendant JARA had controlled substances ready
4    to provide to defendant MEREJIL without advance payment by defendant
5    MEREJIL, and defendant JARA also confirmed this to defendant MEREJIL.
6    <u>Overt Act No. 23:</u>    On or about November 21, 2016, by telephone
7    using coded language, defendant MEREJIL told defendant ROSALES that
8    defendant MEREJIL was prepared to provide defendant ROSALES with
9    controlled substances to settle an outstanding debt.
10    <u>Overt Act No. 24:</u>    On or about November 22, 2016, by telephone
11    using coded language, defendant ROSALES asked defendant MEREJIL to
12    arrange a controlled substances transaction through an unindicted co-
13    conspirator.
14    <u>Overt Act No. 25:</u>    On or about November 22, 2016, by text
15    message using coded language, defendant CHAN told defendant MEREJIL
16    she would obtain controlled substances from defendant JARA on behalf
17    of defendant MEREJIL and deliver those controlled substances to
18    defendant MEREJIL.
19    <u>Overt Act No. 26:</u>    On or about November 22, 2016, defendant
20    CHAN drove to defendant JARA's residence, obtained approximately
21    445.9 grams of methamphetamine from defendant JARA, and drove in her
22    car towards defendant MEREJIL's residence in order to deliver the
23    methamphetamine to defendant MEREJIL, but was stopped by law
24    enforcement before reaching defendant MEREJIL's house.
25    <u>Overt Act No. 27:</u>    On or about November 22, 2016, by telephone
26    using coded language, defendant MEREJIL told defendant RAMIREZ and
27    other unindicted co-conspirators that the police had stopped
28    defendant CHAN, who was bringing him a "pound" of methamphetamine,

1   near defendant MEREJIL's house, and further stated he was considering

2   jumping over the rear wall of his house in order to escape.

3       Overt Act No. 28:    On or about November 22, 2016, by text

4   messages using coded language, defendant MEREJIL warned defendant

5   CONTRERAS and an unindicted co-conspirator that the police had

6   stopped defendant CHAN near his house and that defendant CONTRERAS

7   and others should not come to his house.

8       Overt Act No. 29:    On or about November 23, 2016, defendant

9   ROSALES sent a multimedia message to defendant MEREJIL containing a

10  photograph that depicted two firearms, and by telephone using coded

11  language, defendant MEREJIL confirmed that he received it.

12      Overt Act No. 30:    On or about November 23, 2016, by text

13  message using coded language, defendants MEREJIL and ROSALES

14  discussed the need to avoid law enforcement.

15      Overt Act No. 31:    On or about November 23, 2016, by text

16  message and telephone using coded language, defendant MEREJIL

17  coordinated with defendant GARCIA and the EST Inmate regarding

18  picking up controlled substances from defendant DIAZ and sending them

19  to the EST Inmate in Kern Valley State Prison.

20      Overt Act No. 32:    On or about November 23, 2016, by text

21  message using coded language, defendant MEREJIL agreed to coordinate

22  with defendant DIAZ to ship a controlled substance to the EST Inmate.

23      Overt Act No. 33:    On or about November 23 and 24, 2016, by

24  text message using coded language, the EST Inmate reminded defendant

25  MEREJIL to pick up controlled substances from defendant DIAZ that

26  would be packaged for delivery to the EST Inmate at Kern Valley State

27  Prison.

28

Overt Act No. 34:    On or about November 24, 2016, by text message using coded language, defendant JARA proposed that defendant MEREJIL enter into a payment plan or make a trade to compensate defendant JARA for the methamphetamine that had been seized by law enforcement from defendant CHAN, and defendant MEREJIL suggested that if defendant JARA could provide defendant MEREJIL with additional controlled substances, defendant MEREJIL would be able to repay the debt quickly, and suggested meeting.  Defendant JARA responded that he would accept a handgun that had not been used in a crime to reduce defendant MEREJIL's debt for the lost methamphetamine.

Overt Act No. 35:    On or about November 24, 2016, by text message using coded language, defendant MEREJIL told defendant JARA that if defendant MEREJIL had $1,600 he would have sent that to pay defendant JARA for the methamphetamine that had been seized by law enforcement from defendant CHAN, and offered instead to provide a box of 2500 rounds of ammunition for an AR-15 assault rifle.

Overt Act No. 36:    On or about November 25, 2016, by text message using coded language, the EST Inmate provided information to defendant MEREJIL regarding payment for controlled substances that defendant MEREJIL was causing to be sent to the EST Inmate.

Overt Act No. 37:    On or about November 25, 2016, an unindicted co-conspirator caused $500 to be sent by wire transfer to defendant RAMIREZ, and in a text message using coded language notified defendant MEREJIL that the unindicted co-conspirator had wired the $500.

Overt Act No. 38:    On or about November 25, 2016, by text message and telephone calls using coded language, defendant JARA requested a photograph of the firearm defendant MEREJIL proposed to

exchange in partial or full satisfaction for the methamphetamine that had been seized by law enforcement from defendant CHAN.

Overt Act No. 39:   On or about November 26, 2016, by text message and telephone using coded language, defendant MEREJIL and defendant JARA discussed how defendant MEREJIL would repay defendant JARA for the methamphetamine that had been seized by law enforcement from defendant CHAN, including defendant MEREJIL selling controlled substances and trading his Kalashnikov-style firearm and other firearms for a portion of the debt, and defendant MEREJIL ultimately agreed to trade his Kalashnikov-style firearm.

Overt Act No. 40:   On or about November 26, 2016, by text message and telephone using coded language, defendant MEREJIL, defendant RAMIREZ, and the EST Inmate, coordinated and confirmed the EST Inmate's $500 payment to defendant MEREJIL for controlled substances and the provision of additional controlled substances to be delivered to the EST Inmate via defendant DIAZ.

Overt Act No. 41:   On or about November 27, 2016, by text message using coded language, defendant MEREJIL arranged to meet with defendant JARA in order for defendant MEREJIL to inspect controlled substances defendant JARA offered to provide.  Defendant JARA provided his address and defendant MEREJIL agreed to meet defendant JARA.

Overt Act No. 42:   On or about November 27, 2016, defendant MEREJIL traveled to defendant JARA's residence in order to meet defendant JARA.

Overt Act No. 43:   On or about November 27, 2016, by text message and telephone using coded language, defendant MEREJIL sent defendant JARA a photograph of the Kalashnikov-style firearm he was

16

offering to exchange for part of his methamphetamine debt to
defendant JARA and his suppliers, and the two then negotiated the
value of the Kalashnikov-style firearm and the manner in which they
would conduct the transaction.

Overt Act No. 44:    On or about November 27, 2016, by text
message using coded language, defendant MEREJIL advised the EST
Inmate that defendant MEREJIL had obtained controlled substances to
provide to defendant DIAZ for delivery to the EST Inmate.

Overt Act No. 45:    On or about November 28, 2016, by text
message and telephone using coded language, defendant MEREJIL
confirmed to the EST Inmate that defendant MEREJIL would provide
controlled substances that night to defendant DIAZ for delivery to
the EST Inmate, and later that day discussed the logistics of
transferring the controlled substances to defendant RAYO.

Overt Act No. 46:    On or about November 28, 2016, by text
message and telephone using coded language, defendant MEREJIL agreed
to meet with defendant JARA at defendant JARA's residence and deliver
money relating to the methamphetamine that had been seized by law
enforcement from defendant CHAN.

Overt Act No. 47:    On or about November 28, 2016, defendants
MEREJIL and RAMIREZ traveled to defendant JARA's residence to deliver
money in relation to the pound of methamphetamine that had been
seized by law enforcement from defendant CHAN.

Overt Act No. 48:    On or about November 28, 2016, by telephone
using coded language, defendant MEREJIL told defendant CHAN that
defendant MEREJIL had gone to see defendant JARA that day and on the
previous day to offer defendant JARA's suppliers with defendant
MEREJIL's Kalashnikov-style firearm, worth $1,500, to compensate for

the methamphetamine seized by law enforcement from defendant CHAN, and to continue to negotiate future controlled substance transactions with defendant JARA.

Overt Act No. 49:   On or about November 28, 2016, defendant JARA possessed approximately $8,280 in cash at his residence in Hawaiian Gardens, California.

Overt Act No. 50:   On or about November 29, 2016, by telephone using coded language, defendants MEREJIL and ROSALES discussed the fact that defendant MEREJIL presently had controlled substances available for purchase and the price for those controlled substances, defendant ROASLES indicated he presently needed at least a quarter pound of controlled substances, defendant MEREJIL indicated it was available, and defendant ROSALES told defendant MEREJIL that defendant ROSALES expected to receive a shipment of controlled substances the following day.

Overt Act No. 51:   On or about November 30, 2016, by text message and telephone using coded language, defendant MEREJIL updated the EST Inmate on the status of defendant DIAZ's packaging and wrapping of the controlled substances to be delivered to the EST Inmate at the Kern Valley State Prison.

Overt Act No. 52:   On or about November 30, 2016, by telephone using coded language, defendant ROSALES told defendant MEREJIL that defendant ROSALES needed to obtain controlled substances from defendant MEREJIL.

Overt Act No. 53:   On or about November 30, 2016, by telephone using coded language, defendant MEREJIL agreed to provide controlled substances to an unindicted co-conspirator.

18

1   Overt Act No. 54:   On or about November 30, 2016, by text

2   message and telephone using coded language, defendant JARA informed

3   defendant MEREJIL that money had been seized from his house by law

4   enforcement and that he needed defendant MEREJIL to provide $1,900

5   still owed, which defendant MEREJIL agreed to do, and at defendant

6   JARA's request, agreed to investigate whether defendant CHAN had

7   provided information to law enforcement regarding defendant JARA.

8   Overt Act No. 55:   On or about December 1, 2016, by telephone

9   using coded language, defendant MEREJIL directed defendant CHAN to

10  contact defendant JARA and explain to defendant JARA that defendant

11  CHAN had not provided information to law enforcement regarding

12  defendant JARA.

13  Overt Act No. 56:   On or about December 1, 2016, by telephone

14  and text message using coded language, defendant MEREJIL and an

15  unindicted co-conspirator who was driving northbound from the San

16  Diego area discussed the unindicted co-conspirator delivering six

17  units of controlled substances to defendant MEREJIL, and defendant

18  MEREJIL provided his address to the unindicted co-conspirator.

19  Overt Act No. 57:   On or about December 1, 2016, by telephone

20  using coded language, defendant MEREJIL told an unindicted co-

21  conspirator that defendant MEREJIL had run out of high-quality

22  controlled substances but was in the process of obtaining them from a

23  second unindicted co-conspirator, and the first unindicted co-

24  conspirator indicated that she would visit defendant MEREJIL the

25  following day in order to obtain them.

26  Overt Act No. 58:   On or about December 1 and 2, 2016, by text

27  message and telephone using coded language, defendant MEREJIL and the

28

1   EST Inmate agreed on which controlled substances should be provided

2   to defendant DIAZ for delivery to the EST Inmate.

3       Overt Act No. 59:   On or about December 2, 2016, by telephone

4   using coded language, defendant MEREJIL and an unindicted co-

5   conspirator discussed the unindicted co-conspirator's efforts to

6   deliver controlled substances to defendant MEREJIL which were made

7   difficult because of law enforcement's detection of and following the

8   unindicted co-conspirator, and defendant MEREJIL provided the

9   unindicted co-conspirator supplier with the address of another

10  unindicted co-conspirator at which defendant MEREJIL could meet him.

11      Overt Act No. 60:   On or about December 2, 2016, by text

12  message using coded language, defendants MEREJIL and ROSALES

13  discussed obtaining a shipment of controlled substances from an

14  unindicted co-conspirator.

15      Overt Act No. 61:   On or about December 2, 2016, by text

16  message using coded language, defendants MEREJIL and JARA discussed

17  defendant MEREJIL having his Kalashnikov-style firearm to be

18  delivered to defendant JARA's co-conspirator in partial repayment for

19  the loss of methamphetamine that had been seized by law enforcement

20  from defendant CHAN, and defendant JARA indicated that an unindicted

21  co-conspirator would be calling defendant MEREJIL regarding the

22  firearm.

23      Overt Act No. 62:   On or about December 3, 2016, by telephone

24  using coded language, defendant MEREJIL told defendant RAMIREZ to

25  provide defendant ROSALES with two pounds of controlled substances on

26  behalf of defendant MEREJIL, and defendant RAMIREZ acknowledged.

27      Overt Act No. 63:   On or about December 3, 2016, by telephone

28  using coded language, defendant MEREJIL and an unindicted co-

1   conspirator discussed meeting so that defendant MEREJIL could obtain
2   no less than five units of controlled substances from the unindicted
3   co-conspirator, who was delivering the controlled substances.

4        Overt Act No. 64:   On or about December 3, 2016, by telephone
5   using coded language, an unindicted co-conspirator contacted
6   defendant GARCIA, who was using defendant MEREJIL's telephone, and
7   told defendant GARCIA that the unindicted co-conspirator was seeking
8   a pound of controlled substances, which defendant GARCIA conveyed to
9   defendant MEREJIL, and defendant MEREJIL then discussed the price for
10  the controlled substances with the unindicted co-conspirator.

11       Overt Act No. 65:   On or about December 3, 2016, by text
12  message using coded language, defendants MEREJIL and ROSALES
13  discussed obtaining a shipment of controlled substances from an
14  unindicted co-conspirator and the status of the EST DTO supply of
15  controlled substances, because defendant CONTRERAS needed a unit of
16  controlled substances.

17       Overt Act No. 66:   On or about December 4, 2016, by text
18  message and telephone using coded language, defendant MEREJIL and the
19  EST Inmate discussed the logistics of defendant MEREJIL providing
20  controlled substances to the EST Inmate, including that defendant
21  GARCIA had packaged two of the units of controlled substances in
22  balloons and that defendant MEREJIL would deliver them to defendant
23  DIAZ and then provide them to a courier to be brought to the EST
24  Inmate.   Defendant MEREJIL and the EST Inmate also discussed the
25  types of controlled substances defendant MEREJIL would be providing
26  to the EST Inmate.

27       Overt Act No. 67:   On or about December 4, 2016, by telephone
28  using coded language, defendant MEREJIL confirmed with an unindicted

co-conspirator that defendant MEREJIL would transfer his Kalashnikov-style firearm to the unindicted co-conspirator the next day in order to repay defendant MEREJIL's debt for the pound of methamphetamine that had been seized by law enforcement, and then contacted the unindicted co-conspirator holding the Kalashnikov-style firearm, who agreed to drive defendant MEREJIL to conduct the transfer the following day.

Overt Act No. 68:    On or about December 5, 2016, an unindicted co-conspirator possessed, on behalf of defendant MEREJIL, a Kalashnikov-style firearm, namely, a Zastava Arms model PAP M92PV, 7.62x39mm caliber rifle, and a Sig Sauer model P938, 9mm Parabellum caliber semi-automatic pistol, at her residence in Lynwood, California.

Overt Act No. 69:    On or about December 5, 2016, by telephone using coded language, defendant MEREJIL told an unindicted co-conspirator that defendant MEREJIL planned to coordinate with defendant ROSALES in order to obtain a shipment of controlled substances from the unindicted co-conspirator.

Overt Act No. 70:    On or about December 5, 2016, by telephone using coded language, an unindicted co-conspirator called defendant MEREJIL and told defendant MEREJIL that his telephone was being tapped and to use a different telephone to contact her; defendant MEREJIL thereafter changed his telephone number.

Overt Act No. 71:    On or about January 25, 2017, by telephone using coded language, defendant MEREJIL and the EST Inmate agreed that defendant DIAZ would provide $500 to defendant MEREJIL and the EST Inmate would send $800 through Western Union through defendant

1   RAMIREZ to satisfy the total debt for controlled substances of $1,300

2   that the EST Inmate owed defendant MEREJIL.

3        Overt Act No. 72:    On or about January 27, 2017, by text

4   message and telephone using coded language, the EST Inmate advised

5   defendant MEREJIL that he was sending $200 via Wal-Mart money

6   transfer, defendant MEREJIL provided defendant RAMIREZ with

7   information for her to receive the money that had been transferred

8   via Wal-Mart in payment for controlled substances, defendant RAMIREZ

9   advised defendant MEREJIL that defendant RAMIREZ did not reach Wal-

10  Mart in time to pick up the money, and defendant MEREJIL conveyed

11  this to the EST Inmate, who requested that defendant MEREJIL provide

12  the controlled substances to defendants GARCIA or DIAZ.

13       Overt Act No. 73:    On or about January 27, 2017, by telephone

14  using coded language, the EST Inmate asked defendant MEREJIL about

15  the cost of a firearm and defendant MEREJIL agreed to attempt to

16  obtain a firearm.

17       Overt Act No. 74:    On or about January 29, 2017, by text

18  message using coded language, defendant MEREJIL discussed with

19  unindicted co-conspirators about whether an associate of another EST

20  Gang member was the same individual whom defendant MEREJIL believed

21  had provided information regarding defendant MEREJIL to law

22  enforcement.

23       Overt Act No. 75:    On or about January 29, 2017, by text

24  message using coded language, an unindicted co-conspirator told

25  defendant MEREJIL that defendant MEREJIL needed to admonish his

26  associates not to talk loosely regarding their controlled substances

27  trafficking or firearms, and that the activities of the EST DTO

28  needed to be slowed down at the moment on account of law enforcement

activity, and defendant MEREJIL agreed and directed the unindicted
co-conspirator to listen to the unindicted co-conspirator's police
scanner radio.

Overt Act No. 76:    On or about January 30, 2017, by text
message using coded language, defendant MEREJIL agreed with the EST
Inmate that defendant MEREJIL would obtain controlled substances and
provide them to defendant DIAZ, and defendants DIAZ and MEREJIL
arranged to meet.

Overt Act No. 77:    On or about January 31, 2017, by telephone
using coded language, the EST Inmate advised defendant MEREJIL that
the EST Inmate had received some of the controlled substances caused
to be sent by defendant MEREJIL via a female courier, the EST Inmate
stated that defendant GARCIA was ready to assist in transporting
additional controlled substances to the EST Inmate, and defendant
MEREJIL acknowledged and stated that he had people looking for a
firearm at the direction of the EST Inmate.

Overt Act No. 78:    On or about January 31, 2017, by text
message and telephone using coded language, defendant MEREJIL advised
defendant ROSALES to leave a co-conspirator's residence if he was
present there because of law enforcement activity in the area.

Overt Act No. 79:    Between February 2 and 8, 2017, by text
message and telephone using coded language, defendant MEREJIL
brokered the sale and distribution of approximately 60 hydrocodone
pills to an unindicted co-conspirator.

Overt Act No. 80:    On or about February 4, 2017, by telephone
using coded language, defendant MEREJIL agreed to try to obtain
controlled substances for the EST Inmate and deliver them within the
next few days to defendant GARCIA for packaging, and also offered to

1  obtain a .357 caliber revolver for $400 at the direction of the EST
2  Inmate.
3      Overt Act No. 81:   On or about February 5, 2017, by text
4  message using coded language, defendant MEREJIL advised an unindicted
5  co-conspirator that defendant MEREJIL had run out of controlled
6  substances.
7      Overt Act No. 82:   On or about February 5, 2017, in text
8  messages using coded language, defendant MEREJIL admonished defendant
9  RAMIREZ that defendant MEREJIL had provided her controlled substances
10 free of charge.
11     Overt Act No. 83:   On or about February 5, 2017, by telephone
12 using coded language, defendant MEREJIL directed an unindicted co-
13 conspirator to call a third party in order to obtain a pound of
14 controlled substances and then made the same request to another
15 unindicted co-conspirator.
16     Overt Act No. 84:   On or about February 6, 2017, by text
17 message and telephone using coded language, defendant MEREJIL and the
18 EST Inmate discussed the logistics of sending controlled substances
19 to the EST Inmate and later confirmed that the controlled substances
20 would be packaged by defendant GARCIA and then transferred to
21 defendant DIAZ to be sent to the EST Inmate.
22     Overt Act No. 85:   On or about February 6, 2017, by text
23 message and telephone using coded language, defendant MEREJIL
24 contacted defendant GARCIA and told defendant GARCIA that defendant
25 MEREJIL needed defendant GARCIA to package one unit of controlled
26 substances, to which defendant GARCIA agreed.
27
28

1    Overt Act No. 86:   On or about February 7, 2017, by telephone
2  using coded language, defendant MEREJIL referred an unindicted co-
3  conspirator to defendant ROSALES to obtain controlled substances.

4    Overt Act No. 87:   On or about February 8, 2017, by text
5  message using coded language, defendant MEREJIL asked defendant
6  GARCIA whether defendant GARCIA had delivered to defendant DIAZ the
7  package of controlled substances destined for the EST Inmate, and
8  defendant GARCIA replied that he would package and deliver the
9  controlled substances to defendant DIAZ the next day, which defendant
10  MEREJIL reported to the EST Inmate.

11    Overt Act No. 88:   On or about February 8, 2017, by telephone
12  using coded language, defendant MEREJIL told the EST Inmate that
13  defendant MEREJIL had learned of another .357 caliber firearm that
14  was cheaper and a better brand that might be obtained for $360,
15  agreed to provide defendant DIAZ with the controlled substances to be
16  sent to the EST Inmate, and agreed to contact defendant CONTRERAS in
17  order to attempt to obtain the controlled substances from defendant
18  GARCIA.

19    Overt Act No. 89:   On or about February 8, 2017, by text
20  message and telephone using coded language, defendant MEREJIL
21  directed defendant CONTRERAS to wake up defendant GARCIA and tell
22  defendant GARCIA that the EST Inmate wanted his controlled substances
23  delivered, and defendant GARCIA confirmed that he had completed
24  wrapping the controlled substances intended for the EST Inmate and
25  had not himself kept any of the controlled substances intended for
26  the EST Inmate.

27    Overt Act No. 90:   On or about February 9, 2017, by text
28  message using coded language, an unindicted co-conspirator offered to

26

1  defendant MEREJIL to check the price of a pound of controlled

2  substances, and defendant MEREJIL agreed to discuss the matter after

3  the unindicted co-conspirator came home from work.

4      Overt Act No. 91:   On or about February 9, 2017, by text

5  message and telephone using coded language, defendant MEREJIL

6  arranged to collect the controlled substances intended for the EST

7  Inmate, traveled to San Pedro to meet with defendant GARCIA to obtain

8  them, and then delivered the controlled substances to defendant DIAZ

9  and confirmed with the EST Inmate that the delivery had been made.

10     Overt Act No. 92:   On or about February 14, 2017, by text

11 message using coded language, the EST Inmate told defendant MEREJIL

12 that the EST Inmate had received the controlled substances defendants

13 MEREJIL, DIAZ, and GARCIA had caused to be delivered to him.

14     Overt Act No. 93:   On or about February 16, 2017, by telephone

15 using coded language, defendant MEREJIL told an unindicted co-

16 conspirator to contact defendant ROSALES regarding controlled

17 substances.

18     Overt Act No. 94:   On or about February 18, 2017, by telephone

19 using coded language, an unindicted co-conspirator told defendant

20 MEREJIL that the CO Distributor was in the area and was trying to

21 contact other EST DTO associates of defendant MEREJIL's but had been

22 unable to do so, whereupon defendant MEREJIL contacted defendant

23 GARCIA in order to have defendant GARCIA contact defendant CONTRERAS

24 to have defendant CONTRERAS coordinate with the CO Distributor.

25     Overt Act No. 95:   On or about February 19, 2017, by telephone

26 using coded language, defendant CONTRERAS confirmed with defendant

27 MEREJIL that defendant CONTRERAS had made arrangements to provide the

28 CO Distributor with controlled substances for $2,350.

_Overt Act No. 96:_  On or about March 9, 2017, by text message using coded language, defendant CONTRERAS asked the CO Distributor to provide payment for controlled substances that had been provided to the CO Distributor by defendant CONTRERAS, and the CO Distributor responded that the CO Distributor's controlled substances trafficking activities had been slow and that the CO Distributor would contact defendant CONTRERAS the following Monday to obtain an account number from defendant CONTRERAS into which the CO Distributor could deposit the proceeds.

_Overt Act No. 97:_  On or about March 10, 2017, by text message using coded language, defendant MEREJIL requested additional controlled substances from an unindicted co-conspirator to sell because defendant ROSALES had only been able to provide defendant MEREJIL with one unit of controlled substances.

_Overt Act No. 98:_  On or about March 11, 2017, by text message using coded language, defendant MEREJIL told defendant RAMIREZ that he believed his telephone number being was tapped by law enforcement.

_Overt Act No. 99:_  On or about March 13, 2017, by telephone using coded language, defendant ROSALES asked defendant MEREJIL to monitor his police scanners.

_Overt Act No. 100:_  On or about March 13, 2017, by telephone using coded language, the CO Distributor asked defendant CONTRERAS if defendant CONTRERAS had an account number for the CO Distributor, and defendant CONTRERAS inquired how much money the CO Distributor would be sending to defendant CONTRERAS, to which the CO Distributor responded $1,500, and CONTRERAS then stated that he would obtain an account number and provide it to the CO Distributor shortly.

<u>Overt Act No. 101:</u>  On or about March 13, 2017, by text message using coded language, defendant CONTRERAS sent the CO Distributor the account number XXXXXX8237 and the name of the account holder.

<u>Overt Act No. 102:</u>  On or about March 14, 2017, the CO Distributor deposited $1,500 into the Wells Fargo Bank account bearing account number XXXXXX8237 at a Wells Fargo branch in Delta, Colorado.

<u>Overt Act No. 103:</u>  On or about March 15, 2017, by telephone using coded language, defendant CONTRERAS and the CO Distributor discussed numerous aspects of their controlled substances trafficking, including the amount of money the CO Distributor owed, defendant CONTRERAS' payment for and "taxes" owed, the increased price of controlled substances, the CO Distributor's owing money for controlled substances for which the CO Distributor had not received payment, the slow pace of sales, the CO Distributor's efforts to clear his debt, the CO Distributor paying for controlled substances on the first and fifteenth of the month, and the possibility of the CO Distributor delivering controlled substances to a location approximately four hours from the CO Distributor.

<u>Overt Act No. 104:</u>  On or about March 19, 2017, by telephone using coded language, defendant ROSALES agreed to provide an ounce of controlled substances to defendant MEREJIL.

<u>Overt Act No. 105:</u>  On or about March 20, 2017, defendant MEREJIL facilitated a telephone conversation between two unindicted co-conspirators designed to help one of the unindicted co-conspirators collect tax proceeds related to the controlled substances trade.

2:18-cr-00774-JAK    Document 1    Filed 11/08/18    Page 30 of 41    Page ID #:30

Overt Act No. 106:  On or about March 23, 2017, by text message using coded language, defendant ROSALES told defendant MEREJIL that defendant ROSALES had controlled substances to provide to defendant MEREJIL.

Overt Act No. 107:  On or about March 27, 2017, by text message using coded language, defendant MEREJIL told an unindicted co-conspirator that defendant MEREJIL wanted to obtain controlled substances from defendant ROSALES.

Overt Act No. 108:  On or about March 27, 2017, by telephone using coded language, defendant ROSALES told defendant MEREJIL that defendant ROSALES was in the process of obtaining controlled substances, and defendants ROSALES and MEREJIL agreed to meet at a later time in order to divide those controlled substances between them.

Overt Act No. 109:  On or about March 29, 2017, by text message using coded language, defendant CONTRERAS asked about the CO Distributor's controlled substances distribution operation status.

Overt Act No. 110:  On or about March 31, 2017, defendant RAYO traveled from Los Osos, California, to the area of Bakersfield, California, for the purpose of smuggling controlled substances into the Kern Valley State Prison.

Overt Act No. 111:  On or about April 1, 2017, defendant RAYO met with an unindicted co-conspirator in or near Bakersfield, California, and accepted methamphetamine for smuggling into Kern Valley State Prison.

Overt Act No. 112:  On or about April 1, 2017, by text message using coded language, defendant CONTRERAS told the CO Distributor that it was the first of the month and inquired regarding the CO

Distributor's payment for controlled substances, and stated that he and unindicted co-conspirators would have an account number ready to accept the CO Distributor's payment in two days.

Overt Act No. 113: On or about April 1, 2017, by text message using coded language, defendant RAYO attempted to reach the EST Inmate via a contraband cellular telephone being kept by the EST Inmate and others in Kern Valley State Prison.

Overt Act No. 114: On or about April 1, 2017, defendant RAYO smuggled controlled substances into Kern Valley State Prison inside a body cavity, with the intent that they would be delivered to the EST Inmate by another unindicted co-conspirator inmate.

Overt Act No. 115: On or about April 2, 2017, defendant RAYO smuggled approximately 52.08 grams of methamphetamine contained within two candy bar wrappers into Kern Valley State Prison inside a body cavity, with the intent that it would be delivered to another unindicted co-conspirator who was incarcerated at the prison and the EST Inmate.

Overt Act No. 116: On or about April 2, 2017, by text message using coded language, defendant MEREJIL and an unindicted co-conspirator discussed defendant MEREJIL selling controlled substances to the unindicted co-conspirator via a courier the unindicted co-conspirator did not fully trust.

Overt Act No. 117: On or about April 2, 2017, by text message using coded language, defendant MEREJIL told an unindicted co-conspirator that he believed he was being watched by law enforcement, who were waiting for him to make a mistake that would allow him to be arrested, but that law enforcement officers would have to kill him in order to apprehend him.

1    Overt Act No. 118:  On or about April 3, 2017, by text message
2    using coded language, defendants MEREJIL and ROSALES discussed
3    settling an outstanding debt related to the purchase of controlled
4    substances and trying to obtain additional controlled substances.

5    Overt Act No. 119:  On or about April 3, 2017, by text message
6    using coded language, defendant CONTRERAS asked the CO Distributor
7    about the status of the CO Distributor's drug payment, and the CO
8    Distributor responded that he had not met with the individual
9    delivering him money that day but would let defendant CONTRERAS know
10   the status in the morning.

11   Overt Act No. 120:  On or about April 4, 2017, by telephone
12   using coded language, the CO Distributor told defendant CONTRERAS
13   that the individual who owed money to the CO Distributor had not met
14   the CO Distributor, but that the CO Distributor could pay $1,000 now,
15   and defendant CONTRERAS responded that defendant CONTRERAS would
16   supply the CO Distributor with an account number for depositing the
17   $1,000.

18   Overt Act No. 121:  On or about April 4, 2017, by text message
19   and telephone using coded language, defendants MEREJIL and ROSALES
20   discussed obtaining controlled substances from an unindicted co-
21   conspirator.

22   Overt Act No. 122:  On or about April 5, 2017, by text message
23   using coded language, defendant MEREJIL told an unindicted co-
24   conspirator controlled substances supplier that he and defendant
25   ROSALES were both out of controlled substances and asked the
26   unindicted co-conspirator to supply them to defendant MEREJIL.

27   Overt Act No. 123:  On or about April 5, 2017, by text message
28   using coded language, defendant CONTRERAS provided account number

XXXXXX8237 and the name of the account holder, into which the CO
Distributor should deposit $1,000.

Overt Act No. 124:  On or about April 5, 2017, by text message
and telephone using coded language, the CO Distributor and defendant
CONTRERAS discussed the particulars of potential firearms the CO
Distributor could buy for defendant CONTRERAS, and defendant
CONTRERAS asked the CO Distributor to obtain prices for certain types
of firearms.

Overt Act No. 125:  On or about April 6, 2017, by text message
using coded language, defendant CONTRERAS directed the CO Distributor
to send $1,000 and reconfirmed the account into which the CO
Distributor should deposit the $1,000.

Overt Act No. 126:  On or about April 7, 2017, the CO
Distributor deposited $1,000 into the Wells Fargo Bank account
bearing account number XXXXXX8237, at a Wells Fargo branch in Delta,
Colorado.

Overt Act No. 127:  On or about April 7, 2017, by telephone
using coded language, defendant MEREJIL agreed to provide an
unindicted co-conspirator with defendant ROSALES' telephone number so
the unindicted co-conspirator could obtain controlled substances from
defendant ROSALES.

Overt Act No. 128:  On or about April 26, 2017, defendant
ROSALES sold approximately 27.25 grams of methamphetamine to a CS
("CS2").

Overt Act No. 129:  On or about May 12, 2017, defendant ROSALES
possessed a .45 caliber handgun, seven rounds of .45 caliber
ammunition, a .22 caliber handgun, and five rounds of .22 caliber
ammunition at his residence in San Pedro, California.

<u>Overt Act No. 130:</u>  On or about May 15, 2017, in Delta, Colorado, the CO Distributor possessed approximately 437.1 grams of methamphetamine that had been provided to him by defendant CONTRERAS for further redistribution, along with cocaine and marijuana.

<u>Overt Act No. 131:</u>  On or about May 23, 2017, defendant MEREJIL showed CS2 a notebook containing entries recording the amounts owed by unindicted co-conspirators to defendant MEREJIL for controlled substances, totaling approximately $38,680.

<u>Overt Act No. 132:</u>  On or about December 20, 2017, defendant GARCIA possessed EST Gang paraphernalia, methamphetamine-use paraphernalia, and controlled substances packaging material including balloons, cellophane, small Ziploc bags and latex gloves at his residence in Gardena, California.

<u>Overt Act No. 133:</u>  On or about December 20, 2017, defendant GARCIA possessed controlled substances hidden in his shoe, which he removed and swallowed when he was about to undergo a strip search conducted by officers of the Torrance Police Department.

1

COUNT TWO

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3     On or about March 10, 2016, in Los Angeles County, within the

4 Central District of California, defendant ALEJANDRO SANDOVAL, also

5 known as "Squeaky," knowingly and intentionally possessed with intent

6 to distribute at least fifty grams, that is, approximately 81.44

7 grams, of methamphetamine, a Schedule II controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              COUNT THREE

                [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

      On or about March 10, 2016, in Los Angeles County, within the
Central District of California, defendants CARMEN MEREJIL, also known
as ("aka") "Caveman," and ALEJANDRO SANDOVAL, aka "Squeaky,"
knowingly and intentionally possessed with intent to distribute at
least fifty grams, that is, approximately 8.902 kilograms, of
methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about July 19, 2016, in Los Angeles County, within the Central District of California, defendant EDWARD ROSALES, also known as "Solo," knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 27.6 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT FIVE

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3    On or about November 22, 2016, in Los Angeles County, within the

4 Central District of California, defendant CHITO JARA knowingly and

5 intentionally distributed at least fifty grams, that is,

6 approximately 445.9 grams, of methamphetamine, a Schedule II

7 controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about November 22, 2016, in Los Angeles County, within the Central District of California, defendant ESTHER CHAN knowingly and intentionally possessed with intent to distribute at least fifty grams, that is, approximately 445.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[18 U.S.C. § 922(g)(1)]

On or about May 12, 2017, in Los Angeles County, within the Central District of California, defendant EDWARD ROSALES, also known as "Solo" ("ROSALES"), knowingly possessed a firearm, namely, a North American Arms model NAA22MS, .22 Winchester Magnum Rimfire caliber revolver, bearing serial number E312997, and ammunition, namely, five rounds of Armscor Precision, Inc., .22 caliber ammunition and six rounds of Winchester .45 Auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant ROSALES had been convicted of at least one of the following felony crimes, each punishable by imprisonment for a term exceeding one year:

(1)    Assault with a Firearm, in violation of California Penal Code Section 245(a)(2), in the Superior Court of the State of California, County of Los Angeles, case number NA078815, on or about April 12, 2013;

(2)    Assault with a Deadly Weapon, in violation of California Penal Code Section 245(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number NA078815, on or about April 12, 2013;

//

//

1      (3)  Taking Vehicle Without Owner's Consent, in violation of

2  California Vehicle Code Section 10851(a), in the Superior Court of

3  the State of California, County of Los Angeles, case number YA088818,

4  on or about June 2, 2014.

5

6                                    A TRUE BILL

7

8                                    /S/
                                     _____

9                                    Foreperson

10  NICOLA T. HANNA
    United States Attorney

11

12

13  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
14  Chief, Criminal Division

15  JUSTIN R. RHOADES
    Assistant United States Attorney
16  Chief, Violent & Organized Crime
    Section
17

18  JEFF MITCHELL
    Assistant United States Attorney
    Deputy Chief, Violent & Organized
19  Crime Section

20  GREGORY A. LESSER
    Assistant United States Attorney
21  Violent & Organized Crime Section

22

23

24

25

26

27

28